# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| RHI MAGNOLIA OF NORTH TEXAS, LLC, | § § § | |
| *Plaintiff* | § | |
|  | § | Case No.  SA-26-CA-01411-XR |
| v. | § | |
|  | § | |
| MAGNOLIA HOSPICE COMPANY, INC.; NOSOTROS HOSPICE, INC., | § § | |
| *Defendant* | § § | |

## ORDER ON COMPETING MOTIONS FOR PRELIMINARY INJUNCTIONS

On this date, the Court considered Plaintiff's Amended Motion for a Preliminary Injunction (ECF No. 10), Defendants' Motion for a Preliminary Injunction (ECF No. 35), and the briefing associated with both (ECF Nos. 18, 19, 21, 41).  After careful consideration, Plaintiff's Motion for a Preliminary Injunction (ECF No. 10) is **GRANTED**, and Defendants' Motion for a Preliminary Injunction (ECF No. 35) is **DENIED.**

## BACKGROUND

Plaintiff RHI Magnolia of North Texas, LLC provides hospice and palliative-care services in Texas and Georgia.  ECF No. 9 at 2.  Plaintiff has had a physical location just north of Austin, Texas since well before 2020, initially in Round Rock and now in Pflugerville.  Plaintiff opened a location in San Marcos, Texas—which is between Austin and San Antonio—in January 2024. ECF No. 18-8 at 2.  But Plaintiff served customers in San Marcos and the surrounding area before they opened a physical location there.  *See* PI Exs. 36, 39.

Plaintiff's Pflugerville and San Marcos locations use the name "Magnolia Hospice," as did its Round Rock location.  *Id.*  Plaintiff's predecessor-in-interest[1] began using the "Magnolia

---

[1] For simplicity, the Court generally does not distinguish between Plaintiff and its predecessor-in-interest in this Order.

Hospice" name in Texas as early as January 2013.  ECF No. 9-3.  But the trademark was not federally registered until March 2024.  ECF No. 18-2 at 10.

In April 2020, Defendant Nosotros Hospice, Inc. began offering hospice and palliative-care services under the name "Magnolia Hospice Company."  ECF No. 18-1 at 3.  Nosotros offered its services in Bexar County, Texas (which includes San Antonio) and the adjacent counties.  *Id.*

Around early 2021, Plaintiff's higher-ups became aware that Plaintiff had "received phone calls from patients . . . looking for" Magnolia Hospice Company.  ECF No. 9-5 at 1.  As a result of this confusion, Plaintiff sent a cease-and-desist letter to Nosotros in March 2021, asking it to stop using the "Magnolia Hospice Company" name.[2]  ECF No. 9-5.  Nosotros continued using the name.  ECF No. 9 at 6.

On October 17, 2024, Plaintiff sent another cease-and-desist letter, addressed to "Magnolia Hospice Company."  ECF No. 9 at 7.  The same day, Defendant Magnolia Hospice Company, Inc. was formed "to prevent Plaintiff from registering a Texas business name that would prevent" Nosotros from using the "Magnolia Hospice Company" name.  ECF No. 28 at 9.  Magnolia Hospice Company, Inc. "is a shell company only, and has never conducted any business of any nature."  ECF No. 18-1 at 3.  Defendants did not stop using the "Magnolia Hospice Company" name after Plaintiff's October 2024 cease-and-desist letter.  ECF No. 28 at 10–11.

Plaintiff sent yet another cease-and-desist letter in February 2025.  ECF No. 28 at 11. Defendants responded in March 2025, asserting that they had superior rights to the "Magnolia Hospice" mark within their trade territory.  ECF No. 28 at 12; ECF No. 9-8.  Plaintiff requested proof of these superior rights, but Defendants did not respond.  ECF No. 28 at 12.

---

[2] The letter is dated March 8, 2020, but the parties agree that it was actually sent in 2021.  ECF No. 28 at 9–10.

Defendants still operate as "Magnolia Hospice Company." *Id.* And Plaintiff has provided evidence that patients and healthcare providers continue to confuse Plaintiff with Defendants.

In March 2026, Plaintiff sued Defendants for federal trademark infringement; unfair competition, false designation of origin, and passing off under the Lanham Act; Texas-law trademark infringement; and Texas-law unfair competition. ECF Nos. 2, 9. Defendants have since brought counterclaims. ECF No. 25.

Plaintiff moves for a preliminary injunction prohibiting Defendants from using the "Magnolia Hospice" trademark pending a final resolution of this case. ECF Nos. 4, 10. The Court held a hearing on the motion on June 16, 2026. ECF No. 37. Defendants have filed a competing motion for a preliminary injunction. ECF No. 35.

## DISCUSSION

### I.   Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy that should not be granted unless the movant demonstrates by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). To determine the likelihood of success on the merits, the Court looks to the standards provided by the substantive law. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985).

"[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). So if a movant has shown a substantial likelihood of success on their prima facie case, a nonmovant can still defeat a

preliminary injunction "by showing that they are likely to succeed on an affirmative defense." *Janvey v. Alguire*, No. 3:09-CV-724-N, 2010 WL 11619267, at \*6 (N.D. Tex. June 10, 2010).

## II.    Likelihood of Success on the Merits

Because Plaintiff has shown a substantial likelihood of success on its prima facie case and Defendants have not shown a likelihood of success on their affirmative defenses, Plaintiff has a substantial likelihood of success on the merits.

### a.    Plaintiff has Shown a Prima Facie Likelihood of Success on the Merits

To succeed on a trademark infringement claim under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, a "plaintiff must first 'establish ownership in a legally protectible mark, and second, . . . show infringement by demonstrating a likelihood of confusion.'" *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010) (alteration in original).[3]   The parties do not dispute that "Magnolia Hospice" is a protectible mark or that Plaintiff owns the mark as a general matter.  *See also Amazing Spaces*, 608 F.3d at 237 ("Registration of a mark with the [US]PTO constitutes prima facie evidence of the mark's validity and the registrant's exclusive right to use the registered mark in commerce with respect to the specified goods or services.").

---

[3] "A trademark infringement and unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.'" *Id.* at 236 n.7.  Further, the parties do not meaningfully distinguish between Plaintiff's infringement claims and its other claims.  So the Court does not separately analyze Plaintiff's claims for unfair competition, false designation of origin, and passing off.  *See Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 386 (5th Cir. 1977) ("Trademark infringement is a narrower aspect of unfair competition; both turn primarily on the likelihood of customer confusion."); *Hamdan v. Tiger Bros. Food Mart, Inc.*, No. CV 15-00412-BAJ-EWD, 2016 WL 1192679, at \*3 (M.D. La. Mar. 22, 2016) ("A claim for false designation of origin under the Lanham Act arises when any person uses a mark in connection with any goods or services, the use of which is likely to cause confusion, mistake, or affiliation."); *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985) ("As a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition.").

Further, testimony at the hearing revealed that Plaintiff has not registered the "Magnolia Hospice" trademark with the state of Texas.  It has thus failed to show likelihood of success on its state-law statutory trademark infringement claim. *See* TEX. BUS. & COM. CODE § 16.102(a); *Priority Design & Serv., Inc. v. Plaza*, No. SA-19-CV-00058-OLG, 2019 WL 2124677, at \*3 (W.D. Tex. May 15, 2019) (collecting cases for the proposition that "courts have repeatedly held that a trademark must be registered in Texas in order to maintain a cause of action under Section 16.102").

They do, however, dispute whether there is a likelihood of confusion. To determine whether a likelihood of confusion exists, courts consider eight factors: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

### 1. The Mark Is Relatively Weak

To start, the "Magnolia Hospice" mark is relatively weak.

> Strength of a trademark is determined by two factors. The first factor considers where the mark falls on a spectrum: Marks may be classified as generic, descriptive, suggestive, or arbitrary and fanciful. Within this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks.

*Id.* at 330. "The second factor is the standing of the mark in the marketplace." *Id.*

The "spectrum measures two separate aspects of trademarks—distinctiveness and strength." *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020). Distinctiveness is a condition for federal registration, *id.*, and the parties do not dispute that the mark here is distinctive.

As to strength, "[a] strong mark is usually fictitious, arbitrary or fanciful," *id.*, while suggestive marks are "comparatively weak." *Id.* But "classification of the mark on the spectrum is not conclusive of strength." *Id.* (cleaned up). And a suggestive mark's strength generally depends on other factors, such as whether it is recognized in the market and whether there is widespread third-party use of the mark. *See id.* at 290–291 & nn.6–8.

The parties agree that the "Magnolia Hospice" mark is not descriptive or generic. ECF No. 35 at 4–5; ECF No. 10-1 at 16. But they dispute whether it is suggestive or arbitrary and

fanciful.  "A *suggestive* term suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods and services."  *Amazing Spaces*, 608 F.3d at 241.  "*Arbitrary* or *fanciful* terms," on the other hand, "bear no relationship to the products or services to which they are applied."  *Id.*

"Magnolia Hospice" is suggestive.  Defendants provide unrebutted evidence that the bark and flowers of the Southern Magnolia tree "hav[e] compounds that provide anxiety relief and other calming and stress reducing effects."  ECF No. 18-1 at 3.  Anxiety relief, calmness, and stress reduction have at least some relationship to hospice and palliative care.  Although this connection is somewhat attenuated, it is not "no relationship" at all.  The mark is not arbitrary or fanciful but, rather, is suggestive.  So its strength will depend on other factors.

Third-party use of a mark cuts against that mark's strength.  *See, e.g.*, *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 815 (5th Cir. 2019), as revised (Jan. 29, 2019), as revised (Feb. 14, 2019) (finding that a suggestive mark's strength was "undercut" in part by "widespread third-party use").  "[A]ll third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak."  *Rex Real Estate I, L.P. v. Rex Real Estate Exch., Inc.*, 80 F.4th 607, 621 (5th Cir. 2023).  But third-party usage in "the same industry or category of services" is "especially relevant."  *Id.*  "[T]he key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff."  *Id.*

Here, Defendant has provided evidence that the word "magnolia" is widely used in the healthcare and senior living industries.  ECF No. 18-3.  Most of the entities that Defendants identify as using the word are located outside of Texas.  But some are in the state, *see id.* at 23, 84, 103, 105, 131, and others are in nearby states like Mississippi and Louisiana, *see id.* at 20, 27, 52,

102, 139, 155.  In light of this widespread third-party use, the mark is likely relatively weak.  But since Defendants have not provided evidence of third-party use in central Texas, this factor weighs only slightly against a finding of likelihood of confusion.

### 2.  The Marks Are Very Similar

The second factor is the similarity between the marks.  Plaintiff's trademark is "Magnolia Hospice," and Defendant's is "Magnolia Hospice Company."  These marks are very similar.  Simply adding a generic term like "company" does not meaningfully reduce the likelihood of confusion.  "Courts have repeatedly held that the confusion created by use of the same word as a primary element in a trademark is not counteracted by the addition of another term."  *Cont'l Connector Corp. v. Cont'l Specialties Corp.*, 492 F. Supp. 1088, 1095 (D. Conn. 1979); *Vynamic, LLC v. Diebold Nixdorf, Inc.*, No. CV 18-577, 2019 WL 193660, at *5 (E.D. Pa. Jan. 15, 2019) ("A party cannot avoid trademark infringement by appropriating the key features of a mark but adding some additional terms.") (citing *Cont'l Connector Corp.*, 492 F. Supp. at 1095).  This factor weighs heavily in favor of a likelihood of confusion.

### 3.  The Parties Offer the Same Services

The parties offer the same services—hospice and palliative care.  ECF No. 35 at 11–12; ECF No. 10-1 at 17.  So the third factor also weighs in favor of a likelihood of confusion.

### 4.  The Parties Have Significant Customer Overlap

The Parties also appear to have a significant overlap in potential customers.  Defendants serve patients in Bexar County and the adjacent counties, including Comal County.  Plaintiff has provided evidence that it also has many patients in Comal County.  *See* PI Ex. 42.  As a result, the fourth factor supports a likelihood of confusion.

### 5. *The Parties Use Similar Advertising Methods*

The fifth factor is the similarity of advertising media used. Here, both parties advertise online through their websites, but Defendants emphasize that they rely more heavily on outreach to healthcare and eldercare providers and "other locations in the territory." ECF No. 18-1 at 4–6. At the preliminary injunction hearing, Plaintiff presented testimony from Elvis Jaimes, a former "marketing liaison" at Plaintiff's Pflugerville location. In that role, Jaimes worked with community clinics, doctors, and other facilities to get referrals. He also testified about being "out educating the community on [Plaintiff's] services." Plaintiff's corporate representative, Donny Maberry, testified that Plaintiff has invested a significant amount in educational materials for advertising purposes. This testimony suggests that Plaintiff engages in the same kinds of outreach that Defendants do. The parties appear to use similar methods of advertising, meaning this factor also weighs in favor of likelihood of confusion.

### 6. *There Is Insufficient Evidence to Find That Either Party Intended to Confuse*

The sixth factor is "intent to confuse." "Proof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement." *Coach Inc. v. Sassy Couture*, No. SA-10-CV-601-XR, 2012 WL 162366, at *7 (W.D. Tex. Jan. 19, 2012). But such intent "may provide compelling evidence of a likelihood of confusion" and can be independently "sufficient to justify the inference that there is confusing similarity." *Id.*

Plaintiff argues that Defendants have "recklessly disregarded whether their use of the mark would confuse the public." ECF No. 17–18. But even assuming that is enough to show intent for purposes of this factor, Plaintiff has not provided sufficient evidence that Defendants acted with reckless disregard. Plaintiff points out that Defendants continued using the mark after Plaintiff sent cease-and-desist letters indicating that actual confusion was occurring. But while this

8

suggests that Defendants were aware of Plaintiff's use of the mark, it does not establish reckless disregard. There is no evidence that Defendants acted the way they did for any reason except their belief that they had senior rights to the mark in their trade area. Defendants have pointed to no authority suggesting that refusal to forfeit a trademark one believes they have the right to use constitutes reckless disregard.

Defendants, for their part, argue that *Plaintiff* intends to confuse customers. As evidence, they point out that Plaintiff "embeds the term 'MAGNOLIA HOSPICE' in the software that generates the website for" Plaintiff's facilities in San Antonio, which go by different names. ECF No. 35 at 13. As a result, Plaintiff's website appears among the results of a Google search for "magnolia hospice san antonio." ECF No. 35 at 13–14. Defendants say this "can only indicate a marketing scheme based on the tremendous drawing power of Nosotros' 'MAGNOLIA HOSPICE COMPANY' name" in the San Antonio area. The Court disagrees—it seems more likely that Plaintiff embedded "MAGNOLIA HOSPICE" into its website to capitalize on the reputations of its nearby facilities in San Marcos and Pflugerville, both of which go by that name.

Because neither party appears to have intended to confuse, the sixth factor is neutral. *See Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 195 (5th Cir. 2018) ("If there is no evidence of intent to confuse, then this factor is neutral.").

### 7. There Is Evidence of Actual Confusion

Evidence of actual confusion is the "best evidence of a likelihood of confusion." *Id.* at 197. At the hearing, the Court heard testimony that Plaintiff has received many faxes and phone calls meant for Defendants. And multiple healthcare providers have mistaken Plaintiff for Defendants during Plaintiff's outreach efforts. This factor strongly suggests a likelihood of confusion.

### 8. *Potential Customers Exercise Some Care*

The final factor is the degree of care that potential customers exercise. "Under this digit, the greater the care potential purchasers exercise, the less likely it is they will confuse a junior mark user's products or services with the senior mark user's products or services." *Springboards to Educ.*, 912 F.3d at 817. Defendants assert that purchasing decisions in the hospice and palliative care industry "are made by, or in close consultation with, patients' physicians, case managers and like persons, all of whom are professionals." Plaintiff does not refute that statement. This factor thus weighs against a likelihood of confusion.

### 9. *Considering All Eight Factors, There Is a Likelihood of Confusion*

Taking all eight factors together, Plaintiff is likely to establish a likelihood of confusion. "The ultimate question is whether . . . it is likely potential purchasers" would confuse Plaintiff and Defendant. *See id.* at 817. The mark's relative weakness and the level of care customers exercise in making purchasing decisions in the hospice and palliative care industries weigh against a likelihood of confusion. But the factors favoring likelihood of confusion—especially the evidence of actual confusion, the close similarity between the marks, and the fact that the parties offer the same services in overlapping markets—are determinative here. Plaintiff has a substantial likelihood of establishing its prima facie case.

b. <u>Defendants Have Not Established a Likelihood of Success on Their Affirmative Defenses</u>

Still, Defendants can defeat Plaintiff's showing of a likelihood of success on the merits "by showing that they are likely to succeed on an affirmative defense." *Janvey*, 2010 WL 11619267, at *6. They raise two affirmative defenses: (1) the *Tea Rose-Rectanus* doctrine and (2) the *Dawn Donut* defense against injunctive relief. They have not shown a likelihood of success on either.

        *1. Defendants Have Not Shown a Likelihood of Success Based on the* Tea Rose-Rectanus *Doctrine*

Defendants primarily rely on the *Tea Rose-Rectanus* doctrine, which the Supreme Court adopted in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916),[4] and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918).  Under this common law doctrine, a junior user of a trademark can establish priority over a senior user if the junior user adopted the mark (1) in good faith and (2) in a market that was, at the time of the junior user's adoption of the mark, "wholly remote" from the senior user's market.  *S. Tex. Neon Sign Co., Inc. v. Ixtapa, Inc.*, No. 5:08-CV-116, 2009 WL 10695794, at *8 (S.D. Tex. Aug. 14, 2009).

        A. The *Tea Rose-Rectanus* Doctrine Can Apply to Intermediate Junior Users of a Contestable, Federally Registered Mark

Although *Tea Rose-Rectanus* is a common law doctrine, it can apply to federally registered trademarks in some circumstances.  Relevant here, an "intermediate junior user"—that is, "one who adopted the mark after the senior user but before the senior user's registration," *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990)—may raise the *Tea Rose-Rectanus* defense if the senior user's registered mark is not "incontestable."  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:51 (5th ed.); *see* 15 U.S.C. § 1115(a) (Registration of a mark "shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.").

A registered mark can become "incontestable" when it "has been in continuous use for five consecutive years subsequent to the date of [its] registration and is still in use in commerce."  15 U.S.C. § 1065.[5]  An incontestable mark's "federal registration constitutes *conclusive* evidence of

---

[4] "Tea Rose" was the trademark at issue in *Hanover Star Milling*, which is why the phrase appears in the doctrine's name.  *See Hanover Star Milling*, 240 U.S. 403.

[5] The following conditions must also be met for a trademark to become incontestable:

its validity, subject only to" certain defenses enumerated by statute. *Perry v. H. J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 471 (5th Cir. 2021) (emphasis in original); 15 U.S.C. § 1115(b).

Nosotros is an intermediate junior user of the trademark.[6] It began operating as "Magnolia Hospice Company" in April 2020. ECF No. 18-1 at 3. Plaintiff's predecessor-in-interest used the "Magnolia Hospice" name as early as January 2013. ECF No. 9-3. But Plaintiff did not register the mark until March 2024. ECF No. 18-2 at 10. So Nosotros began using the mark "after the senior user but before the senior user's registration." *See GTE Corp.*, 904 F.2d at 541.

Further, the mark is not incontestable, since it has been less than five years since its registration. If the *Tea Rose-Rectanus* defense's elements are met, it can apply in this case.

> B. Defendants' Market Likely Was Not "Wholly Remote" from Plaintiff's Market at the Time Defendants Adopted the Mark

Defendants' reliance on *Tea Rose-Rectanus* is misplaced because they have not shown a likelihood that their market was "wholly remote" from Plaintiff's when Defendants adopted the

---

(1) there has been no final decision adverse to the owner's claim of ownership of [the] mark for [the relevant] goods or services, or to the owner's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Director within one year after the expiration of [the] five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and other matters specified in paragraphs (1) and (2) hereof; and

(4) no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered.

15 U.S.C. § 1065(1)–(4).

[6] Magnolia Hospice Company "is a shell company only, and has never conducted any business of any nature." ECF No. 18 at 3. So it likely has no independent rights in the trademark, regardless of the *Tea Rose-Rectanus* defense. *See Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("[N]either conception of the mark nor advertising alone establishes trademark rights at common law. Rather, ownership of a trademark accrues when goods bearing the mark are placed on the market." (cleaned up)). But because Magnolia Hospice Company and Nosotros are related entities, the Court generally refers to them jointly in this Order.

mark in April 2020. "A 'remote' territory is one where, at the critical date of the junior user's first use, the senior user's mark was not known by customers in that territory, such that no one would have been confused as to source." *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, 331 F. Supp. 3d 581, 596 (E.D. La. 2018); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:4 (5th ed.). "A mark is wholly remote if 'the mark means one thing in one market, [and] an entirely different thing in another;' in other words, whether a mark is wholly remote is a question of the territorial dimension of the likelihood of confusion." *Ixtapa*, 2009 WL 10695794, at *8. Geographic distance is generally not determinative, *id.*, but it is relevant, *see Ixtapa*, 2009 WL 10695794, at *9 (denying summary judgment on remote use. in part because of the relatively close distance between the relevant markets).

Defendants identify their market as "Bexar County, Texas and the adjacent counties," including Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties. ECF No. 18-1 at 4. When Defendants began using the name "Magnolia Hospice Company" in April 2020, Plaintiff's closest physical location to Bexar County was in Pflugerville, Texas. According to Google Maps, Pflugerville is about 80 miles from the edge of Bexar County and about 45 miles from the edge of Comal County.[7] And Plaintiff's Pflugerville location served customers beyond Pflugerville itself, *see* PI Ex. 36, meaning the markets were even closer to one another.

This close proximity is significant, though not determinative, evidence that the markets were not remote. In *South Texas Neon Sign Co., Inc. v. Ixtapa, Inc.* the court denied a motion for summary judgment based on the *Tea Rose-Rectanus* defense, partially because the relatively close

---

[7] *See McCormack v. Hiedeman*, 694 F.3d 1004, 1008 n.1 (9th Cir. 2012) (taking judicial notice of a Google map and satellite image for the purpose of determining approximate distance between two locations).

proximity between the parties' markets suggested they might not be remote from one another. 2009 WL 10695794, at *9. There, the parties operated out of Laredo, Texas and Pharr, Texas respectively. *Ixtapa*, 2009 WL 10695794, at *1. According to Google Maps, those locations are about 150 miles apart, notably further than Pflugerville is from Defendants' market. *Ixtapa* was at a different posture than this case, but it still suggests that the close proximity between the markets here is some evidence in Plaintiff's favor.

More concretely, Plaintiff's corporate representative testified that the practical service area for a hospice is about 75 miles. He also explained that a hospice company's employees are often based outside the company's central offices—Plaintiff's Pflugerville office has employed people in, for example, Hays County, which is south of Austin and adjacent to Comal County. Based on this testimony and the markets' close proximity, the Court finds it likely that hospice companies based in the Austin area could reasonably serve patients in the San Antonio area and vice versa. And, in fact, Plaintiff began working to build relationships in New Braunfels—which is in Comal County—"immediately" after acquiring Magnolia Hospice in February 2020.

Evidence of actual confusion between Plaintiff and Defendants shortly after Defendants began using the trademark also suggests that the markets were not remote. Because remoteness is "an issue of the territorial dimension of likelihood of confusion," 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:4 (5th ed.), evidence of actual confusion is highly relevant, *cf. Viacom*, 891 F.3d at 197 ("[A]ctual confusion . . . is the 'best evidence of a likelihood of confusion.'"). In March 2021, less than a year after Defendants began using the name "Magnolia Hospice Company," Plaintiff's predecessor sent Defendants a cease-and-desist letter indicating that it had "received phone calls from patients . . . looking for" Defendants. ECF No. 9-5 at 1. Plaintiff's corporate representative testified that this kind of confusion was likely happening for

14

some time before Plaintiff's higher-ups knew about it, because Plaintiff's own employees assumed that Defendants' company was related to Plaintiff. The fact that actual confusion occurred so quickly after Defendants adopted the mark strongly suggests that the markets were not wholly remote at the time.

Finally, it appears that in 2020 Plaintiff had at least one patient in Comal County, which Defendants identify as part of their trade territory. *See* PI Ex. 36 (map showing locations of Plaintiff's patients in 2020). The evidence on this point is limited and suggests that Plaintiff did not have many patients in Defendant's trade territory as of April 2020. But it provides at least some evidence that the markets were not wholly remote.

In sum, the close proximity between the markets, Plaintiff's efforts to enter Defendants' market before Defendants began using the mark, the actual confusion that occurred shortly thereafter, and the evidence that Plaintiff had at least some patients in Defendants' trade territory around the time Defendants began using the mark all suggest that the parties' markets were not wholly remote as of April 2020. As a result, Defendants have not shown that they are likely to establish that the *Tea Rose-Rectanus* doctrine applies.

### 2. Defendants Have Not Shown a Likelihood of Success on Their Dawn Donut Defense

Defendants also rely on *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959), which "has been followed within the Fifth Circuit." *Gorgeous Gals, LLC v. Hey Gorgeous! Spa & Wellness, LLC*, No. 1:16-CV-903-RP, 2017 WL 5016036, at *8 (W.D. Tex. Nov. 2, 2017). Under the *Dawn Donut* defense, "there is no likely confusion for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory." 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:33 (5th ed.).

15

Plaintiff has already entered Defendants' trade territory.  As noted above, Defendants identify their trade territory to include Comal County.  Plaintiff has had patients in Comal County since at least 2020, *see* PI Ex. 36, and currently seems to have several customers in that county, *see* PI Ex. 42.  Defendants have provided no evidence suggesting that Plaintiff has not actually entered their territory or does not plan to.  *Dawn Donut* does not preclude injunctive relief here.

Because Plaintiff has shown a substantial likelihood of success on their prima facie case and Defendants have not shown a likelihood of success on either of their affirmative defenses, Plaintiff has established a substantial likelihood of success on the merits.

### III.    Irreparable Harm

A showing of likelihood of success on the merits of a federal statutory trademark claim gives rise to a "rebuttable presumption of irreparable harm."  15 U.S.C. § 1116(a).  But "even if the trademark owner demonstrates a likelihood of success . . . there may be other equities that weigh in favor of a denial of a preliminary injunction.  For example, delay in moving for a preliminary injunction is often cited as a reason for denying a preliminary injunction." *BeatStars, Inc. v. Space Ape Ltd.*, 624 F. Supp. 3d 681, 687 (W.D. Tex. 2022) (emphasis omitted).  That is because, for preliminary injunction purposes, "'[i]rreparable' injury connotes ongoing serious harm that calls for prompt action."  *Id.*  "Delay in seeking a preliminary injunction tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial." *Id.*

Plaintiff's predecessor-in-interest knew about Defendants' use of the trademark and the associated actual confusion by March 2021.  ECF No. 9-5 at 1.  Plaintiff knew by October 2024 at the latest.  ECF No. 9 at 7.  Yet Plaintiff did not move for a preliminary injunction until March 2026.  *Id.*  Courts in this circuit have denied preliminary injunctions based on shorter delays

16

than that. *See BeatStars*, 624 F. Supp. 3d at 689 (collecting cases for the proposition that "[c]ourts in this District have denied preliminary injunctions due to delays shorter than" nine months).

Plaintiff argues that its delay in *bringing suit* should not count against it—rather, Plaintiff says, the question is how long a party delayed *between suing and requesting a preliminary injunction*. That position is untenable. Delay undermines a showing of irreparable harm at the preliminary injunction stage because it suggests that "there is not a very pressing need for immediate extraordinary relief and that the plaintiff, having itself delayed, can well afford to wait until a full-scale trial can be held." *See id.* at 688–89. A delay between filing suit and moving for a preliminary injunction is no more relevant to that issue than a delay in bringing suit. Under Plaintiff's theory, someone requesting a preliminary injunction ten years (or longer) after discovering the relevant harm would have acted with sufficient urgency, but only if they *also* waited to sue. At the same time, someone who sued immediately but waited five months to request a preliminary injunction likely would have delayed too long. *Id.* at 689 ("[D]istrict courts in this circuit have generally declined to grant injunctive relief where a plaintiff, without sufficient explanation, delayed for five months or more in seeking injunctive relief."). A movant would be considered to have acted with more urgency because—in addition to delaying its request for a preliminary injunction—it delayed suing. But, if anything, delay in bringing suit suggests even less urgency and thus weighs against a finding of irreparable harm at the preliminary injunction stage.

Still, Plaintiff has shown a high enough likelihood of irreparable harm that its delay does not defeat its motion. As noted above, delay "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial." *Id.* at 687. But the record reflects more than "infringement alone." Further, much of the likely irreparable harm will affect Plaintiff

17

only indirectly, by harming its patients.  Plaintiff's lack of urgency might undermine its claim that it will be *directly* irreparably harmed pending trial.  But it is much less probative regarding the likelihood of irreparable harm to patients, who do not own the trademark so could not have brought this suit to prevent Plaintiff's delay.

Irreparable harm to a healthcare provider's patients can constitute irreparable harm to the provider.  *Cf. New Orleans Home for Incurables, Inc. v. Greenstein*, 911 F. Supp. 2d 386, 409–10 (E.D. La. 2012) (finding a likelihood of irreparable harm to a nursing home based in part on the likelihood that its residents would suffer "transfer trauma" if the nursing home was forced to close).  Plaintiff has received many communications meant for Defendants.  Some have included sensitive patient information.  Others have come from patients or their families requesting potentially time-sensitive services, such as medication refills.  At one point, one of Plaintiff's patients accidentally called Defendants to request a visit.  But because the patient called the wrong provider, Plaintiff never received the call, and the patient did not receive the visit.  This kind of confusion is likely to result in Plaintiff's patients (and Defendant's patients) not receiving necessary care.  Plaintiff has thus shown a likelihood of irreparable harm absent a preliminary injunction.

## IV.    Balance of Harms

Plaintiff must also show "that the threatened injury outweighs any harm that may result from the injunction to the non-movant."  *Valley*, 118 F.3d at 1051.  Both Plaintiff and Defendants have invested substantial sums in their "Magnolia Hospice" brands.  If the injunction is denied, Plaintiff's investment is at least arguably diminished, and its patients are likely to experience the serious irreparable harm discussed above.  If the injunction is granted, Defendants will be forced to operate under a different name.  Having to use a different name will certainly impose costs, but

Defendants represent that their "services are promoted almost entirely through personal relationships with physicians, case managers, and other relevant influencers." ECF No. 18 at 15. In light of that, operating under a different name is unlikely to significantly alter Defendants' business or reputation. The balance of harms supports a preliminary injunction.

## V.    Public Interest

Finally, Plaintiff must show "that the grant of an injunction will not disserve the public interest." *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 543 (5th Cir. 2023). "[A]lthough . . . the public has an interest in encouraging commercial competition, [it] also has an interest in the effective enforcement of our trademark laws." *Id.* at 546. Plaintiff has satisfied the final requirement for a preliminary injunction.

## VI.    Security

Rule 65(c) allows a court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But a court "may elect to require no security at all." *A.T.N. Indus., Inc. v. Gross*, 632 F. App'x 185, 192 (5th Cir. 2015) (quoting *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)).

Defendants have provided no indication of what amount would be proper to pay any costs and damages they might sustain if the preliminary injunction is later found improper. So the Court exercises its discretion not to require security in this case.

## VII.    Defendants' Motion for a Preliminary Injunction

Defendants' motion for a preliminary injunction (ECF No. 35) relies on the *Tea Rose-Rectanus* doctrine. As described above, Defendants have not shown a likelihood of success

on that issue.  So their motion for a preliminary injunction (ECF No. 35) is denied for failure to show likelihood of success on the merits.

<strong>CONCLUSION</strong>

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction (ECF No. 10) is **GRANTED**, and Defendants' Motion for a Preliminary Injunction (ECF No. 35) is **DENIED**.

Defendants are **PRELIMINARILY ENJOINED** from (i) infringing on Plaintiff's Mark, including but not limited to, using and/or operating under the directly infringing names "Magnolia Hospice," "Magnolia Hospice Company, Inc.," or close iterations thereof; and (ii) engaging in any unfair competition, false designations of origin, and/or unlawful passing off related to Plaintiff's mark and services.

It is so **ORDERED**.

**SIGNED** this 30th day of June, 2026.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE